**BRIAN CLEWER, INC., a California corporation dba Ambassador International Travel, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., a New York corporation; Trans World Airlines, Inc., a New York corporation; British Airways plc., a foreign corporation, Defendants.**

**No. CV 86–119 CBM.**

United States District Court, C.D. California.

May 9, 1986.

---

## MEMORANDUM ORDER GRANTING DEFENDANTS' MOTION TO DISMISS.

CONSUELO BLAND MARSHALL, District Judge.

This matter is before the Court on defendants Pan American World Airways, Inc., Trans World Airlines, Inc., and British Airways' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to F.R.Civ.P. 12(b)(6). Defendants also move to transfer this action to the United States District Court of the District of Columbia.[1] The issue presented by defendants' motion to dismiss

---

1. The Court will not address defendants' motion to transfer this action to the United States District Court of the District of Columbia since the motion to transfer has become moot due to the Court's decision granting defendants' motion to dismiss.

is whether plaintiff Brian Clewer, Inc. has standing under § 4 of the Clayton Act to bring a suit for alleged antitrust violation against defendant airlines. A hearing was held on May 5, 1986, before the Honorable Consuelo B. Marshall, United States District Court Judge, presiding.

## FACTS

Plaintiff Brian Clewer, Inc., dba Ambassador International Travel, brings this antitrust suit for violation of §§ 1 and 2 of the Sherman Act claiming treble damages pursuant to § 4 of the Clayton Act for alleged injuries sustained to its business due to the conduct of defendants Pan American World Airways, Inc., Trans World Airlines, Inc., and British Airways.

Plaintiff is a travel agency "engaged in the sale of air transportation and related services in Southern California, Arizona and Nevada." (Complaint, ¶ 3). According to the complaint, plaintiff had a contractual agreement with Laker Airways Limited ("Laker") whereby plaintiff sold tickets on Laker's flights between Los Angeles and the United Kingdom to its own customers and other travel agents in Southern California in exchange for commissions by Laker in excess of those paid to other Laker ticket sellers. (Complaint, ¶ 7). Plaintiff characterizes itself as a "marketer of air transportation and related services" or "distributor or jobber" selling the product, i.e., the airline tickets, which were "produced" or "manufactured" by Laker. (Opposition to Motion to Dismiss, at 16–17). By this contractual arrangement, the complaint alleges that defendant airlines "directly competed with Clewer for the sale of air transportation and related services between Southern California and the United Kingdom." (Complaint, ¶ 8).

According to the complaint, defendant airlines and other unnamed entities conspired "to restain and to monopolize trade and commerce in Southern California for the sale of air transportation between Southern California and the United Kingdom" (Complaint, ¶ 10). The alleged antitrust violation is described as follows:

"12. The defendants agreed with each other and with others to fix prices for air transportation between Southern California and the United Kingdom. The defendants agreed with each other and with others to charge prices for air transportation between Southern California and the United Kingdom which were predatory with the object of diverting passengers from Laker's services and damaging Clewer's business. In further pursuit of their unlawful scheme, the defendants made excessive and unlawful payments to divert customers from Clewer. The defendants coordinated the scheduling of their Los Angeles–London flights to divert passengers to their services who might otherwise have flown on Laker and bought tickets from Clewer. The defendants spread false rumors that Laker was going out of business which damaged Clewer's business.

13. The defendants conspired with each other and with others to force Laker out of business. After Laker ceased operations, the defendants refused Clewer's requests to enter into commercially reasonable arrangements with Clewer."

(Complaint, ¶¶ 12, 13).

## DISCUSSION

§ 4 of the Clayton Act broadly defines the class of persons who may maintain a private damages action under the antitrust laws. § 4 provides that:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fees."

Although the above language is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of antitrust violation, the Supreme Court has interpreted the statute to be subject to certain constraints. *Associated General Contractors v. Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 906, 74 L.Ed.2d 723 (1983). "Congress did not in-

**785**

tend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534, 103 S.Ct. at 906, *citing, Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 891, n. 14, 31 L.Ed.2d 184 (1972). "An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but despite the broad working of § 4 there is a point beyond which the wrongdoer should not be held liable ... It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Id.* 459 U.S. at 534–535, 103 S.Ct. at 906–907, *citing, Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–477, 102 S.Ct. 2540, 2546–2547, 73 L.Ed.2d 149 (1982).

Accordingly, courts must determine whether an antitrust plaintiff is a proper party to bring a private antitrust action. *Id.* 459 U.S. at 535, n. 31, 103 S.Ct. at 907, n. 31. This determination "requires an inquiry beyond that performed to determine standing in a constitutional sense." *Bubar v. AMPCO Foods, Inc.,* 752 F.2d 445, 448 (9th Cir.), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985). Indeed, the determination of whether an antitrust plaintiff has standing to recover under the Clayton Act requires an "evaluation of plaintiff's harm, the alleged wrongdoing by the defendant, and relationship between them." *Id.* at 448–449.

In *Associated General,* the Supreme Court cautioned against the mechanical use of black letter rules to dictate a particular result, and instead instructed the lower courts to analyze each factual situation in light of the policy factors discussed in its opinion. *Associated General,* 459 U.S. at 536, n. 33, 103 S.Ct. at 907, n. 33. In *Bubar,* the Ninth Circuit summarized those policy factors as follows:

"1) the nature of the plaintiff's alleged injury—whether it was the type the antitrust laws were intended to forestall,

2) the directness of the injury,

3) the speculative measure of the harm,

4) the risk of duplicative recovery, and,

5) the complexity in apportioning damages."

*Bubar,* 752 F.2d at 449.

Accordingly, each of the policy factors will be discussed herein.

1) Clewer's Alleged Injury.

In order to establish that the injury sustained by a § 4 plaintiff is the type of injury the antitrust laws were intended to forestall, plaintiffs

"must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl–O–Mat. Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

In the present case, the complaint alleges in conclusory terms that "Clewer's injury was of the type of injury that the antitrust laws were intended to forestall. Clewer was a direct competitor of defendants. The defendants' conduct resulted in the diminution of competition in the market." (Complaint, ¶ 15). At the outset, it should be noted that in a motion to dismiss pursuant to F.R.Civ.P. 12(b)(6), the complaint should be construed in the light most favorable to plaintiff and its allegations taken as true. However, courts do not have to accept every allegation in the complaint as true in considering its sufficiency; rather, courts will examine whether conclusory allegations follow from the description of facts as alleged by plaintiff. 5 *Wright & Miller,* § 1357 at 595–597.

According to the complaint, Clewer's alleged injury stems from defendant airlines' conspiracy to fix predatory prices for airline tickets with the object of diverting customers from Laker and to harm Clewer; to spread false rumors that Laker was going out of business; to force Laker out of business; and to refuse to enter into

commercially reasonable commission arrangements with Clewer. Thus, the complaint does allege a causal connection between an antitrust violation and harm to Clewer and further alleges that the defendant airlines intended to cause that harm. "[H]owever, the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry.... an allegation of improper motive, although it may support a plaintiff's damages claim under § 4, is not a panacea that will enable any complaint to withstand a motion to dismiss." *Associated General*, 459 U.S. at 537, 103 S.Ct. at 908. "The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators." *Id., citing, Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479, 102 S.Ct. 2540, 2548, 73 L.Ed.2d 149 (1982).

The Sherman Act was enacted to assure customers the benefits of price competition and case-law has emphasized the central interest in protecting the economic freedom of participants in the relevant market. *Associated General*, 459 U.S. at 538, 103 S.Ct. at 908. Plaintiff's complaint does not allege any marketwide restraint of trade; rather, it alleges unlawful conduct involving predatory behavior directed at Laker, with an adverse result to Clewer, rather than a claim that output has been curtailed or prices enhanced throughout an entire competitive market. *Associated General*, 459 U.S. at 539, n. 40, 103 S.Ct. at 909, n. 40.[2]

In *Associated General*, plaintiff Union brought an action against defendant multiemployer association on the grounds that defendant coerced certain third parties and certain of plaintiff's members to enter into business relationships with nonunion contractors and subcontractors, and such action adversely affected Union's business activities. Under such circumstances, Union was not held to be a consumer or competitor in the market in which trade was restrained, and thus had no standing to assert an antitrust violation. *cf. Blue Shield of Virginia v. McCready*, 457 U.S. at 484, 102 S.Ct. at 2551 (consumer of psychotherapeutic services had standing to sue for antitrust conspiracy to restrain competition in the market for such services since her injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market."); *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739 (9th Cir. 1984) (Kennedy, J., dissenting) (former employee who alleged that he had been discharged and boycotted because of refusal to participate in bid rigging scheme held to have standing to challenge conspiracy to fix prices and allocate sales in the market).

Relying on *Associated General*, defendant airlines assert that Clewer has not suffered any cognizable antitrust injury since Clewer, as a seller of Laker's tickets, was neither a consumer nor competitor in the market in which Laker and defendants competed. Clewer concedes that it is not a consumer nor competitor in the market in which Laker and the defendants competed; however, plaintiff alleges the violation is in a different geographical and functional market. (Opposition to Motion to Dismiss, at 16–17). Clewer defines his market as a distribution or "marketing level of air transportation [in Southern California] as opposed to the production level" of air transportation in the United States.

---

**2.** This case is distinguishable from *Klor's v. Broadway–Hale Store*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) in which a retailer was held to have standing to sue a chain of department stores, national manufacturers and their distributors for an antitrust conspiracy to boycott the sale of goods to plaintiff or to do so only at discriminatory prices and highly unfavorable terms. Such actions which cripple the freedom of traders and thereby restrain their ability to sell in accordance with with their judgment were held to be monopolistic actions forbidden by the Sherman Act. Unlike *Klor's*, Clewer has not alleged any monopolistic boycott on the part of the defendant airlines against Clewer personally nor any action that would cripple the freedom of travel agencies from booking flights in an open competitive airline ticket market. Instead, the complaint appears to focus on Clewer's inability to sell as many Laker tickets as it previously had and Clewer's inability to enter into a commission agreement with defendant airlines which was as commercially lucrative as its previous arrangement with Laker.

The use of the ambiguous terms "marketing" and "production" levels of "air transportation" fails to disguise the practical realities of the markets involved: plaintiff's market does not involve national airline companies involved in providing air transportation between the United States and the United Kingdom, but instead involves Southern California ticket sellers involved in merely distributing the tickets of Laker airlines. The complaint alleges that "the defendants agreed with each other and with others to fix prices for air transportation between Southern California and the United Kingdom," (Complaint, ¶ 12), and that "the defendants agreed with each other and with others to charge prices for air transportation between Southern California and the United Kingdom which were predatory with the object of diverting passengers from Laker and damaging Clewer's business." (Complaint, ¶ 13). These allegations go to an antitrust conspiracy in the airline market in which defendants and Laker competed, and not to the market for the sale of airline tickets. Therefore, the complaint fails to state a cognizable antitrust injury sufficient to confer standing. Based upon plaintiff's characterization of the antitrust violations in the complaint, it is clear that Clewer's alleged injury is not the type injury that the antitrust laws were intended to forestall.

2) The Directness of the Injury.

■■■■ In *Associated General,* the Supreme Court examined the degree to which the asserted injury flowed directly from the alleged violation, and determined that the "chain of causation between the [plaintiff's] injury and the alleged restraint in the market ... contains several somewhat vaguely defined links." *Id.* 459 U.S. at 540, 103 S.Ct. at 909. *Bubar,* 752 F.2d at 453 (potential minority shareholders in a corporation yet to be formed not directly injured). Likewise, the present case also contains links in the chain of causation between Clewer's injury and the alleged restraint in the market.

According to Clewer's complaint, defendant airlines conspired to fix predatory prices and engaged in other anticompetitive actions to divert business from Laker and thereby harm Clewer's business. It is obvious that any injury to Clewer is only an indirect result of whatever harm may have been suffered by Laker, and thus Clewer's injury is derivative of those of Laker's.

In addition, "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as [the plaintiff] Union to perform the office of a private attorney general." *Associated General,* 459 U.S. at 542, 103 S.Ct. at 910.

Defendant airlines suggest that other potential plaintiffs exist here who have claimed more direct harm from the alleged violations than Clewer. The present lawsuit is apparently the fourth in a series of lawsuits filed against defendant airlines for an alleged conspiracy to eliminate Laker from competition. The first action, brought by Laker, was settled in 1985. *Laker Airways Limited v. Pan American World Airways, Inc.,* 109 F.R.D. 541 (D.D.C.). The second action, a consolidation of five class actions brought by Laker passengers who bought tickets between March 1982 and March 1984, has concluded in a preliminary settlement awaiting court approval. *In re North Atlantic Air Travel Antitrust Litigation,* No. 84–1013 (D.D.C.). The third suit is brought by 331 former Laker employees is presently pending before the District Court for the District of Columbia. *Adams v. Pan American World Airways, Inc.,* No. 86–304 (D.D.C.). All of the plaintiffs in the above actions stand in a better posture to assert antitrust claims due to a more direct harm than the present plaintiff.

Defendants aptly note that Clewer stands in the same position of numerous other prospective plaintiffs whose alleged losses are indirect and derivative, i.e., other travel agencies, other supplies of goods and services, food vendors, waste disposal services, and custodians. Regardless of whether the statute of limitations would operate as a bar to other prospective plain-

tiffs' claims, Clewer's injury is too indirect to provide standing under the Clayton Act.

### 3) The Speculative Measure of the Harm.

According to the complaint, "Clewer suffered lost revenues and profits as a direct result of the defendants' unlawful conduct in violation of the antitrust laws." (Complaint, ¶ 14). Clewer alleges that its measure of damages is what Clewer would have earned if the market had not been distorted by the defendants' anticompetitive conduct, and is not measured by Laker's damages whatsoever.

In contrast, defendants allege that in order to prove Clewer's damages, Clewer must first establish the extent to which Laker was injured by the alleged antitrust violation, and then establish Clewer sustained such damages. Since Clewer's profits depended largely on the commission obtained from the sale of Laker tickets, defendants' position correctly assesses the speculative nature of the purported damages. As in *Associated General*, the present claim "rests at bottom on some abstract conception or speculative measure of harm." *Associated General*, 459 U.S. at 543, 103 S.Ct. at 911 (citations omitted).

### 4) Risk of Duplicative Recoveries and the Complexity of Apportioning Damages.

■ Because of the previous claims filed by other plaintiffs against the same defendant airlines for a portion of Laker's revenues, a possibility exists of duplicative recovery against the defendants. In addition, if Clewer and other similarly situated travel agencies are found to have standing to bring antitrust suits against the same defendants, there is a distinct possibility of numerous recoveries for the same antitrust violation. Although Clewer attempts to narrow the geographical scope of the complaint to Southern California, other regional travel agencies could also bring similar lawsuits notwithstanding the statute of limitations period for filing claims. Allowing such indirect plaintiffs to file suits for speculative harms would stretch the param-

eters of § 4 of the Clayton Act beyond its intended purpose.

Based upon the above discussion, the Court concludes that plaintiff Clewer does not have standing under § 4 of the Clayton Act to bring a private cause of action for treble damages for an alleged antitrust violation. Therefore, the Court hereby grants defendants' motion to dismiss the lawsuit for failure to state a claim upon which relief can be granted pursuant to F.R. Civ.P. 12(b)(6).

IT IS SO ORDERED.