Andrew William SCHILLING , a minor, by Briony Jean Foy, Guardian ad Litem, William Schilling, Barbara Schilling and Student Assurance Services, Inc., Time Insurance Company, Plaintiffs-Respondents,†

v.

EMPLOYERS MUTUAL CASUALTY COMPANY , Darlington Community School District, Darlington High School and Michael Dinges, Defendants-Appellants.

Court of Appeals

*No. 96–2165. Submitted on briefs July 9, 1997.—Decided August 14, 1997.*

(Also reported in 569 N.W.2d 776.)

†Petition to review denied.

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Mark J. Mingo* and *Douglas W. Lehrer* of *Mingo & Yankala, S.C.* of Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *John F. Jenswold* and *Briony Jean Foy* of *Jenswold, Studt & Hanson* of Madison.

Before Vergeront, Roggensack and Deininger, JJ.

VERGERONT, J.   The dispositive issue on this appeal is whether Andrew Schilling, a high school student injured at school, is a third party beneficiary of the employment contract between the school district and one of its teachers. The trial court granted a partial summary judgment in Schilling's favor, concluding that he was a third party beneficiary of the employment contract and a third party beneficiary of the school district's insurance contract. Therefore, the trial court held he and his parents could recover up to the $1,000,000 policy limits on a breach of contract

claim because the $50,000 limit on tort claims in § 893.80, STATS., is inapplicable to the contract claim. We granted leave to appeal this nonfinal order pursuant to § 808.03(2), STATS. We conclude that Schilling is not a third party beneficiary of the teacher's employment contract, and this makes it unnecessary for us to address the insurance contract. We reverse.

## BACKGROUND

Schilling was injured when a metal fragment struck him in the eye while he was working in the Darlington High School Technical Education Shop. The shop was under the supervision of Michael Dinges, employed by the school as a teacher of technical education. At the time of the injury, Schilling was working on independent study in the agriculture room, which was adjacent to the machine shop area where Dinges was lecturing to a class. Schilling was having difficulty removing the bearing from a piece of farm equipment and asked Dinges to assist him. Schilling was not wearing safety glasses. Dinges filed a wrench for Schilling to use, putting on safety glasses to do so, and gave the wrench to Schilling, who still could not remove the bearing. As Dinges was assisting Schilling in trying to remove the bearing, it blew apart, striking Schilling in the eye.

The original complaint alleged negligence but was amended to assert a claim for breach of contract on the theory that Schilling was a third party beneficiary of the employment contract between Dinges and the school district and a third party beneficiary of the insurance contract between Employers Mutual Casualty Company and the school district. In response to preliminary motions, the trial court ruled that the

cap of $50,000 in § 893.80(3), STATS.,[1] applied to tort actions but not to actions for breach of contract.

Schilling and defendants[2] both filed motions for partial summary judgment, agreeing that there were no factual issues in dispute but only the legal question of whether Schilling was a third party beneficiary of the employment and insurance contracts.[3]

The facts relevant to the motion came from the depositions of Dinges, David Chellevold, principal of Darlington High School, and Dennis Pratt, superintendent of Darlington School District, as well as the contracts at issue. According to these materials, Dinges had a written contract for the school year during which the injury occurred, signed by Dinges and

---

[1] Section 893.80(3), STATS., provides in part:

> Except as provided in this subsection, the amount recoverable by any person for any damages, injuries or death in any action founded on tort against any volunteer fire company organized under ch. 181 or 213, political corporation, governmental subdivision or agency thereof and against their officers, officials, agents or employes for acts done in their official capacity or in the course of their agency or employment, whether proceeded against jointly or severally, shall not exceed $50,000. The amount recoverable under this subsection shall not exceed $25,000 in any such action against a volunteer fire company organized under ch. 181 or 213 or its officers, officials, agents or employes. If a volunteer fire company organized under ch. 181 or 213 is part of a combined fire department, the $25,000 limit still applies to actions against the volunteer fire company or its officers, officials, agents or employes. No punitive damages may be allowed or recoverable in any such action under this subsection.

[2] In addition to Schilling, his parents, Student Assurance Services, Inc. and Time Insurance Company are plaintiffs. Dinges, Darlington High School, Darlington Community School District and its insurer, Employers Mutual Casualty Company, are defendants.

[3] The motion was for partial summary judgment because the comparative negligence of the parties had to be tried.

officers of the Board of Education of Darlington Community School District. The signed written contract consists of two pages primarily dealing with the term of the contract and Dinges's compensation, and incorporates by reference a Master Contract Agreement between the Darlington Community School District and the Darlington Education Association. Neither the Master Contract nor the two pages state what Dinges is to teach or what his duties are. There is a statement that: "[T]his contract or agreement is subject to . . . the rules, regulations and policies of the School Board. The School Board agrees to make available to the Teacher a written copy of all such rules and regulations."

Principal Chellevold testified that Dinges's duties include classroom instruction in technical education, and part of those duties include instructing the students in safety. Dinges prepares the curriculum plans for his classes, which include a unit on safety, and those curriculum plans are periodically audited or reviewed. The students in his classes are given materials on safety practices prepared by him or other technical education teachers and are tested on these materials. One of the instructions in those materials is to wear eye protection in any activity where eye hazards may exist. Chellevold testified that it is the responsibility of the teacher in charge to see that the students working under his or her supervision follow the safety procedures.

The high school faculty handbook, in a section entitled "Staff Guidelines for the Work Day" states: "You are responsible for your share of supervision. You are personally liable in the eyes of the law if injuries take place in school when proper supervision is not

provided." In a section entitled "Classroom Responsibilities," the handbook provides:

> Liabilities and Responsibilities: There is no question that injuries are more likely to occur when an instructor is absent from his/her teaching station. In the interest of student safety and protection, responsibility has been placed justifiably upon teachers and administrators who are in charge. With practically no exceptions this means being physically present at all times when students are under your supervision. It should be understood that the teachers are responsible for corridor supervision outside their assigned rooms during passing periods, before school, and at dismissal time. Your presence can prevent most of the disorders.

Chellevold testified that this handbook is given to each faculty member. He described the portions just cited as "precautions or guidelines for our teachers." He described the handbook in general as "a document of teachers' schedules. I mean, it covers everything from the bus times to the daily schedules to lunch schedules—just about the general operating procedure." This faculty handbook is not the district policy manual, but whatever is in the faculty handbook "has to come off a larger district policy manual." Chellevold is not free, he testified, to develop "policies operational for the high school contradictory to what the district manual would be."

Superintendent Pratt's testimony concerning the teachers' contracts, the faculty handbook and safety rules was as follows:

> Q: Mr. Pratt, with respect to the contracts that you have with our teachers, are there any particular

provisions within them as to the responsibilities of the teacher other than merely teaching?

A: The contract itself does not cover any particular direction. Each individual area of teaching, in other words, the elementary and the secondary, have separate categories which are covered in the faculty handbook, which is handed out by the principals at the beginning of each school year.

Q: I see. With respect to, let's say, your teachers in the certain types of fields such as physical education or mechanical arts or industrial arts, are there any responsibilities other than the general ones for all teachers because of the particular area in which they are teaching?

A: I would say that any of the areas in which a teacher teaches which requires student safety that they are required to go over and instruct on safety and test accordingly before a student is allowed to use the equipment and the material that we have provided at the school.

Q: It is set forth in some kind of a guideline or handbook?

A: The faculty handbook covers safety. This is not—I would say that each division or each department of the—I believe as far as dealing with safety—would be covered on their own. In general every teacher has a degree in those areas, and safety is one of the first things that they teach.

Q: Your principal has shown us Exhibit 3 [safety rules], which apparently is a manual or a handbook. Is that what you are referring to?

A: This is developed by the tech ed teachers themselves. This is not something that would go out to every teacher in the school district, but this would be to the individual department.

Q:  And this would be applicable to your tech ed teachers?

A:  I believe so. I believe that is where it came from.

Relying in large part on *Mercado v. Mitchell*, 83 Wis. 2d 17, 264 N.W.2d 532 (1978), the trial court determined that Schilling was a third party beneficiary of the employment and insurance contracts. The court stated that, since § 893.80, STATS., "confers immunity for tort claims over $50,000, it would seem this million dollar policy must have been acquired to provide assurance that injured persons would not be left without a meaningful remedy and that students were third party beneficiaries of the contract for insurance."[4]

## DISCUSSION

We review summary judgments de novo, employing the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). Generally, summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

Although the general rule is that only a party to a contract may recover under it, there is an exception for a contract specifically made for the benefit of a third person. *Goossen v. Estate of Standaert*, 189 Wis. 2d 237, 249, 525 N.W.2d 314, 319 (Ct. App. 1994). The person claiming to be a third party beneficiary must

---

[4] The insurance policy had liability limits of $1,000,000 for each occurrence. The policy contains no provision waiving the cap on liability under § 893.80, STATS.

show that the contract was entered into by the parties to the contract directly and primarily for the benefit of the third party. *Id.* An indirect benefit incidental to the contract is not sufficient. *Id.* The contract must indicate that the third party either was specifically intended by the contracting parties to benefit from the contract, or is a member of a class the contracting parties intended to benefit. *Id.* Such a contract is subject to the same rules governing the formation of all contracts. *Pappas v. Jack O.A. Nelsen Agency, Inc.*, 81 Wis. 2d 363, 371, 260 N.W.2d 721, 725 (1978).

The construction of an unambiguous contract is generally a question of law, which we review de novo. *Wausau Underwriters Ins. Co. v. Dane County*, 142 Wis. 2d 315, 322, 417 N.W.2d 914, 916 (Ct. App. 1987). Whether a contract is ambiguous is itself a question of law, which we review independently of the trial court. *Id.* A written contract is ambiguous if it is reasonably susceptible to more than one meaning. *Id.*

While the trial court's decision and Schilling's brief on appeal tend to merge analysis of the employment and the insurance contracts, we consider the contracts separately. We begin with the employment contract, since that is the basis for the breach of contract claim. We understand the contract claim to be that Dinges breached his obligation under his contract to provide adequate supervision of Schilling, which includes enforcement of the safety rules applicable to working in the technical education facilities.

The defendants argue that the undisputed facts do not support the trial court's conclusion that the employment contract was entered into directly and primarily for the benefit of Schilling or of students—a class of which he is a member. Schilling, in response,

relies on the reference in the written contract to the "rules, regulations and policies of the district," which, he contends, makes the faculty handbook, the audited curriculum plans containing a safety unit, and the safety rules developed by Dinges and the other technical education teachers all part of the contract. Schilling then argues that this evidence, together with the testimony of Pratt and Chellevold on the obligations of teachers to teach and enforce safety rules, and Dinges's acknowledgment that safety glasses were required in technical education for certain activities, demonstrate that the parties to the employment contract intended to benefit students with respect to safety measures.

We do not agree that the evidence supports the conclusion that the curriculum plans developed by Dinges and audited by the principal or other district personnel are "rules, regulations [or] policies of the School Board." The plain language of the written contract in no way indicates that the contract is subject to teaching plans prepared by the teachers, and there is no indication in the record that either the principal, the superintendent, or the teacher considers the curriculum plans to come within the contract language. The fact that district personnel audit and review the curriculum plans prepared by the teachers does not make them "rules, regulations, [or] policies of the School Board." We reach the same conclusion with respect to the safety rules prepared by Dinges and other technical education teachers for the instruction and testing of the students.

Whether the faculty handbook is incorporated into the contract through the referenced phrase presents a somewhat closer question, but we conclude that it is not. Chellevold referred to the two cited provisions of

the faculty handbook as "precautions and guidelines." Although only the two pages of the handbook containing the cited provisions are in the record, Chellevold describes the handbook in general as containing "the general operating procedure" of the school. The two pages in the record cover such matters as keeping classrooms neat, conducting one's "social life in a way becoming to your profession," and "taking into account students' individual differences and abilities." We know from Chellevold's testimony that the handbook contains bus schedules and lunch schedules. The entire contents of this handbook could not reasonably be considered "rules, regulations [or] policies of the School Board." And, there is no basis in the record for concluding that only certain provisions of the handbook, such as the ones concerning supervision, are incorporated into the contract. The testimony of neither the principal nor the superintendent suggests that either considers the handbook as a whole, or the supervision provisions in particular, to be incorporated into the written teacher contract.

Even were we to consider the faculty handbook to be incorporated into the contract through the reference to "rules, regulations [or] policies of the School Board," there is no evidence in the contract that the parties to the contract, that is, Dinges and the school district, intended to enter into the contract directly and primarily for the benefit of students. The two-page written contract and the attached Master Contract by their plain terms allocate rights and obligations between the school district and the teacher. Even if we consider the faculty handbook as part of the contract, there is still no indication in the language of the handbook pages in the record that the handbook is anything other than more specific provisions on how

889

teachers are to carry out their responsibilities to the district.

In Schilling's view, it is apparently sufficient to point out that provisions regarding teachers' responsibilities for supervision of students benefit students. This reasoning would apply to all responsibilities of a teacher and follows simply from the fact that the job of a teacher is to educate students, and no one would deny that that benefits students. In this sense, students are incidental beneficiaries of all teachers' employment contracts, and, indeed, all contracts the school district enters into for services to the students. However, this does not satisfy the burden of showing that this teacher and this school board entered into this contract primarily and directly for the benefit of students. No case cited by Schilling, and none we have been able to discover, suggest that the test for a third party beneficiary can be so easily satisfied.

Schilling, like the trial court, relies in large part on *Mercado v. Mitchell*, 83 Wis. 2d 17, 264 N.W.2d 532 (1978). In *Mercado*, the court concluded that a Milwaukee citizen injured on a roller coaster was a third party beneficiary of a contract between the carnival operator and insurance agent to procure sufficient insurance. *Id.* at 28, 264 N.W.2d at 538. A City of Milwaukee ordinance provided that no license to operate a carnival was to be granted unless the applicant filed an insurance policy "with the condition that the applicant will indemnify and save harmless the city of Milwaukee and its officers and agents and citizens against any and all injuries and damages arising from the conducting of the carnival." *Id.* at 21–22, 264 N.W.2d at 535. The operator's policy contained a certificate including the City of Milwaukee as an additional named insured but did not cover roller

coaster rides. *Id.* While recognizing the general rule that liability policies do not convey third party beneficiary status on injured parties, the court concluded that the ordinance and the certificate were evidence that the primary purpose of requiring insurance as a condition of the license was for the protection of the citizens of Milwaukee, not necessarily the protection of the carnival operator.[5] *Id.* at 28–29, 264 N.W.2d at 538.

There is nothing in the record of this case comparable to the ordinance and policy certificate in *Mercado*—no evidence that a primary purpose of the contract between Dinges and the school district was to benefit the students. Similarly, in each of the other cases Schilling cites, there was specific language either in the written contract or, if the contract was oral, in the conversation between the parties, indicating that both contracting parties contemplated benefiting the group to which the third party belonged when they agreed to the contract or the provision sought to be enforced.

In *Journal/Sentinel, Inc. v. Pleva*, 151 Wis. 2d 608, 616–17, 445 N.W.2d 689, 692 (Ct. App. 1989), the court held that a newspaper and members of the public could enforce a provision in a lease between the City of Milwaukee and an organization orchestrating public festivals. The provision stated that the organization's board meetings would be conducted according to the Wisconsin Open Meetings Law. That provision, the court held, demonstrated that a primary purpose of the

---

[5] We note that Schilling and the trial court apparently overlooked the fact that in *Mercado v. Mitchell*, 83 Wis. 2d 17, 264 N.W.2d 532 (1978), the plaintiff was found to be a third party beneficiary of a contract to procure insurance not the insurance contract.

lease was to protect the many public interests affected by the lease by permitting the press and public to attend the board meetings. *Id.* at 616, 445 N.W.2d at 692. Put somewhat differently, the only reasonable interpretation of the open meeting provision was that it was primarily intended to benefit persons other than the two contracting parties—the City of Milwaukee and the organization: there was not a reasonable construction of that provision whereby the public was merely an incidental beneficiary. In contrast, the handbook provisions on supervision and liability benefit the district because the district itself has an interest in limiting its exposure and in providing a safe educational environment for the students in the district. It is not reasonable to conclude from those provisions that the district and the teacher intended to confer contractual benefits on the students.

In *Pappas*, the court held that a company with an interest in the restaurant equipment at the time of a fire was a third party beneficiary under an oral contract to procure insurance covering the restaurant and its contents. *Pappas*, 81 Wis. 2d at 372, 260 N.W.2d at 726. The court reasoned that even though the company did not have an interest at the time the insurance was procured, there was evidence that the person procuring insurance and the insurance agent discussed and intended to procure insurance for parties who had an interest in the restaurant and equipment; the company was a member of that class, and its identity did not have to be known by the insured and the agent at the time insurance was obtained. *Id.* at 373, 260 N.W.2d at 726. There is no comparable evidence of discussions between the contracting parties in this case.

We conclude this case is more similar to *Goossen* than to *Mercado, Journal/Sentinel*, and *Pappas*. In *Goossen*, we concluded that a borrower and prospective home buyer was not the third party beneficiary of a contract between Wisconsin Housing and Economic Development Authority (WHEDA) and the bank, which contained a septic system inspection requirement. *Goosen*, 189 Wis. 2d at 245, 525 N.W.2d at 318. We determined that neither WHEDA's Lender's Manual nor the contract between WHEDA and the bank expressed any intent to directly and primarily benefit borrowers. *Id.* at 250, 525 N.W.2d at 319. Although we recognized that borrowers benefited from the septic system inspection requirement, we concluded that WHEDA's general purpose to benefit first-time home buyers was not sufficient: there had to be evidence that the septic system inspection was directly and primarily intended to benefit borrowers. *Id.*

In support of his position, Schilling points to the testimony of Chellevold and Pratt concerning the duty of teachers to teach and enforce safety rules. However, the contract itself must show that the parties intended to primarily and specifically benefit the students in entering into the contract. *See Schell v. Knickelbein*, 77 Wis. 2d 344, 349, 252 N.W.2d 921, 925 (1977).[6] The

---

[6] Schilling's assertion that this intent can be proved by the parties' testimony necessarily implies that the written terms of the contract are ambiguous. In interpreting a written contract, we consider the testimony of the parties on their intent only if the terms of the written contract are ambiguous. *See Patti v. Western Mach. Co.*, 72 Wis. 2d 348, 351, 241 N.W.2d 158, 160 (1976). Intent is then a question of fact. *See Wausau Underwriters Ins. Co. v. Dane County*, 142 Wis. 2d 315, 322, 417

testimony of Chellevold and Pratt shows that they considered it Dinges's responsibility to supervise his students and teach and enforce safety rules. This is not evidence that they considered this to be a term of his contract with the school district, let alone a term of his contract included for the direct and primary benefit of the students. Similarly, there is no evidence that Dinges considered this responsibility to be a term of his contract, let alone a term intended for the direct and primary benefit of the students. In summary, neither the written contract, even if it were to include the two handbook provisions, nor the testimony of Chellevold and Pratt, indicates an intent by Dinges and the school district that students could sue Dinges for breach of contract if he failed to properly supervise a student.

We also observe that courts in other jurisdictions have declined to consider students as third party beneficiaries to various types of contracts that schools have with other entities. *See Radosevic v. Virginia Intermont College,* 651 F. Supp. 1037, 1038–39 (W.D. Va. 1987) (student injured by detached piece of roof not a third party beneficiary to contract between college

N.W.2d 914, 916 (Ct. App. 1987). We are uncertain whether Schilling really means that the contract language is ambiguous, because that appears to be at odds with his position that there are no disputed issues of fact. We also note that there is no evidence that either Chellevold or Pratt was involved in negotiating Dinges's contract on behalf of the school district, so the relevance of their testimony on the intent of the contracting parties is unclear. However, we find it unnecessary to resolve these issues because, even if we consider all the testimony Schilling wishes us to consider, in addition to the written contract and the faculty handbook, we would still conclude that the undisputed facts show no intent that the contracting parties directly and primarily intended to benefit the students.

894

and maintenance company; distinction between intended and incidental beneficiary rests on concept that courts will not impose unbargained for obligation on a contracting party); *Hairston v. Pacific–10 Conference*, 893 F. Supp. 1485, 1494 (W.D. Wash. 1994), *aff'd*, 101 F.3d 1315 (9th Cir. 1996) (student football players not third party beneficiaries of contract between athletic conference and their college; vague contract language on providing student athletes with quality competitive opportunities insufficient to show that contracting parties intended to assume direct contractual obligation to each student athlete in conference); *Mississippi High School Activities Ass'n, Inc. v. Farris*, 501 So. 2d 393, 396 (Miss. 1987) (student athletes not third party beneficiaries to contract between athletic association and high school; purpose of contract is to benefit school, and while students benefit, too, "it is difficult to imagine a contract entered into by a high school that would not ultimately benefit or affect the student body"). While these cases differ factually and are, of course, not binding on this court, they do illustrate the concerns of other courts with expanding contractual obligations solely because students benefit from the services provided by schools through contracts with others.

Because we conclude that the undisputed facts show that Schilling was not a third party beneficiary of Dinges's employment contract, we do not address the insurance contract. Having no claim for breach of contract, the remaining claims against the defendants are tort claims. The trial court has already ruled that the statutory cap of $50,000 applies to tort claims, and no party argues that is not correct. In response to the defendants' argument in their appellate brief that the school district did not waive the statutory cap by

obtaining insurance with a higher policy limit, Schilling states that is a "non-issue" because it is the contract claim that he asserts is not subject to the statutory cap. We take this as a concession that the statutory cap for tort claims was not waived by the procurement of insurance with higher liability limits. We therefore need not address the insurance contract further.

*By the Court.*—Judgment and order reversed.

ROGGENSACK, J. (*concurring*). I concur with the majority opinion's conclusion that the terms of Dinges's employment contract did not encompass either the safety rules and curriculum developed by the shop instructor under the supervision of the principal, or any of the provisions of the faculty handbook. Because the safety rules were not part of Dinges's employment contract, the failure to implement them could not constitute a breach of that contract, as a matter of law. Therefore, I also concur in the result reached by the majority, that Schilling's contract claim must be dismissed.

However, the conclusion that Dinges's contract did not include the safety provisions upon which the plaintiffs rely is dispositive of the appeal. Therefore, I do not join that part of the majority's opinion which concludes that Schilling was not a third party beneficiary to a provision which we have already determined was not in the contract. *See State ex rel. Schultz v. Bruendl*, 168 Wis. 2d 101, 112, 483 N.W.2d 238, 241 (Ct. App. 1992) (statements which extend beyond the facts of the case or which are broader than necessary to determine the issue before the court are dicta) *and Sweet v. Berge*, 113 Wis. 2d 61, 67, 334

N.W.2d 559, 562 (Ct. App. 1983) (appellate court need only address dispositive issues).

Furthermore, even if the safety provisions had been included in Dinges's employment contract, I am not fully persuaded that the conclusion that they would act to limit the exposure of the school district precludes the conclusion that they might also have been primarily intended to insure the safety of students. I do not address this issue further today because this is not the case in which to decide such a broad question of public importance.